IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

Civil Action No. 12-cv-818

NEFERTITI JAMES,                          )
                                          )
                  Plaintiff,              )
                                          )
v.                                        )          **NOTICE OF REMOVAL**
                                          )
                                          )
BANK OF AMERICA CORPORATION,              )
                                          )
                  Defendant.              )
_____  )


**EXHIBIT 1**
(Verified Complaint)

STATE OF NORTH CAROLINA      IN THE GENERAL COURT OF JUSTICE
                                 SUPERIOR COURT DIVISION

COUNTY OF MECKLENBURG             12-CVS-19063

| | |
|---|---|
| NEFERTITI JAMES, | |
|      Plaintiff, | |
|         v. | **VERIFIED COMPLAINT** |
| BANK OF AMERICA CORPORATION, | |
|      Defendant. | |

COMES NOW Plaintiff Nefertiti James ("James" or "Plaintiff") and hereby complains of the Defendant Bank of America Corporation ("BAC" or "Defendant") and alleges as follows:

## NATURE OF ACTION

1.      James, a former employee of BAC, brings this action against BAC based on her complaints of racial harassment, discrimination, and retaliation in violation of Title VII and 42 U.S.C. § 1981. She alleges causes of action for race discrimination and retaliation, wrongful termination in violation of public policy, negligent retention, negligent supervision, and negligent infliction of emotional distress. She seeks compensatory, liquidated, special and punitive damages, as well as injunctive relief.

## JURISDICTION AND PARTIES

2.      James is a citizen and resident of Charlotte, Mecklenburg County, North Carolina.

3.      Upon information and belief, BAC is a Delaware Corporation, with its principal office and place of business in Charlotte, Mecklenburg County, North Carolina.

## ADMINISTRATIVE PROCEDURES

4.      James timely filed a Charge of Discrimination against BAC with the Equal Employment Opportunity Commission ("EEOC") on or about April 15, 2011 for race

1

Case 3:12-cv-00818-MOC-DSC   Document 1-1   Filed 12/11/12   Page 2 of 35

discrimination and retaliation. James timely filed a second Charge of Discrimination against BAC with the Equal Employment Opportunity Commission ("EEOC") on or about December 13, 2011 for disability discrimination and retaliation, which was then amended on April 10, 2012 to include race and disability discrimination and retaliation.

5.   On or about July 20, 2012, James received a "notice of right to sue" for each of her two charges of discrimination from the EEOC entitling her to commence this action within 90 days of her receipt of that notice.

6.   James filed an Application for Extension of Time to File Complaint with the Mecklenburg County Clerk of Court on October 18, 2012 and received an Order extending time to file the Complaint until November 7, 2012.

7.   James has satisfied all private, administrative and judicial prerequisites to the institution of this action.

**BACKGROUND**

8.   James was hired by BAC's predecessor, Countrywide Financial Corporation ("Countrywide") on March 1, 2004 as a Funding/Post Closing Coordinator or "loan closer."

9.   BAC acquired Countrywide in 2008.

10.   James excelled in this position and was later transferred to a Home Services Specialist II or "loan processor" position on or about January 3, 2011.

11.   In her new position, James' Team Manager ("Team Manager") was a white female. James, who is a black female, felt that Team Manager treated her differently than her white coworkers.

12.   Indeed, Team Manager racially segregated the loan processor employees by placing black employees in one set of cubicles and the white employees in another set of

2

cubicles. Additionally, Team Manager moved the one white employee who was friends with and seated among the minority employees to a cubicle in the white section.

13.     Upon information and belief, Team Manager harassed and discriminated against other blacks and others who associated with them and attempted to intimidate and abuse them.

14.     James specifically requested adequate training before she agreed to accept the loan processor position. The Assistant Branch Manager ("Assistant Branch Manager") (black) promised her that she would receive the requested training. However, James was not given adequate training to perform her new role with BAC despite her repeated requests. When BAC would not provide formal training, she asked for assistance from friends and coworkers. Despite the lack of training, James was tied for the highest number of loans on her team in April 2012.

15.     BAC not only failed to provide James with the training that James needed to succeed in her new role, but Team Manager harassed and humiliated James based on her race in front of coworkers by yelling at her, setting unreasonable tasks and goals, not providing adequate training, singling her out, making her do the work of her white coworkers, and giving her problem loans and difficult customers.

16.     When Team Manager harassed James and instructed her to take on the workload of white coworkers, it was to the detriment of her own work, since she was not allowed to work overtime.

17.     Upon information and belief, white employees were white allowed to work overtime.

18.     On February 28, 2011, James sent an email to Assistant Branch Manager, asking if they could schedule some time to meet and talk in private. Assistant Branch Manager did not respond to James' email.

3

19.     Team Manager treated James in a condescending and demeaning manner based on her race. On March 2, 2011, Team Manager screamed at James across the room in front of her entire team. Team Manager barked orders for James to finish a loan for a coworker who was out of the office on sick leave. James felt enormous pressure in her new position since she lacked the necessary training to complete her tasks. James became stressed and anxious when Team Manager harassed and called her out in front of others.

20.     James pushed through and met the deadline on the Loan which had been the responsibility of a coworker out on sick leave.

21.     At approximately 11:00 a.m., James asked Assistant Branch Manager again if they could meet. Assistant Branch Manager replied that he was busy and would let her know when he had a moment. He said if it was an emergency to let him know. James responded and recounted the incident in which Team Manager yelled and belittled her in front of others and again reiterated that she lacked adequate training to fulfill her job duties. James stated, "You promised that I wouldn't be just thrown into this and I dont [sic] like to half step I take my job serious." James also informed Assistant Branch Manager that Team Manager was "yelling and screaming" at her, and it was "really bothering" her.

22.     After reporting the incident with Team Manager to Assistant Branch Manager, James saw some improvement in office interactions, but it was short lived. Team Manager continued to single out James and criticized her for minor things.

23.     Additionally, Team Manager discriminated against James by forcing her to assist other white loan processors with their tasks so they could meet their goals, but which prevented her from excelling in her own goals. For instance, On April 5, 2011, a white coworker and friend of Team Manager, told James that per Team Manager, James was supposed to help her

4

with her loans, even though James had a busy day herself and submitted two loans to closing. James assisted the white coworker to the best of her ability but was unable to meet the coworker's unreasonable expectation that James finish the work before day's end. Accordingly, James spent most of the next day assisting the coworker, thereby neglecting her own loans and workload.

24. On the following days, April 6 and April 7, James again spent time assisting the same white coworker and another temporary assistant, also white, with their respective files, in addition to a handling problem files reassigned to James.

25. At the end of the day on April 7th, James asked Team Manager if she could stay an additional 15 minutes to finish up some of her welcome calls, which were tasks that she needed to complete on her own loans. In response, Team Manager denied James' request and interrogated James for failing to manage her time during the day, although Team Manager knew or should have known that James was assisting white coworkers as directed by Team Manager.

26. At 6:08 p.m. on April 7, 2011, Team Manager sent James an email stating it was Team Manager's second request for James to complete her welcome calls, when James had not received a first request from Team Manager.

27. On April 8, 2011, shortly before 10:00 a.m., James asked a coworker about a particularly complicated loan that Team Manager had assigned to her from the coworker at noon the previous day ("the Loan"). James asked the coworker to provide her with the background of the Loan's process to date.

28. The coworker was upset when she learned that the Loan was reassigned to James because she had already put a lot of work into the Loan and the customer was difficult. The

Case 3:12-cv-00818-MOC-DSC   Document 1-1   Filed 12/11/12   Page 6 of 35

coworker warned James that the customer would be irate if she knew the Loan was reassigned to another individual.

29.    At 10:00 a.m., James received an email from Team Manager telling her to contact the customer by noon to give her an update on the Loan. About fifteen minutes later, Team Manager yelled across the room asking James if she had contacted the customer yet, to which James responded she had not. Then fifteen minutes later, Team Manager again screamed at James needed to call the borrower, "right now."

30.    At 10:27 a.m., Team Manager sent James another email instructing James to let her know when she talked to the customer.

31.    At this point, James was terrified. She was shaking and the back of her head was throbbing, and she began to cry. James' coworker recognized James' distress and suggested they take a walk.

32.    Before she left, at 10:47 a.m. James replied to Team Manager's initial email and said that she would call the customer before noon. James also told Team Manager that she was not feeling well and needed to go to the emergency room. As James was getting up to go on her break and take a walk with the coworker, Team Manager continued to berate James and ordered James into her office. Upon seeing James' distress, the coworker and another manager assisted James outside and informed Team Manager that she could not talk at that time.

33.    When she went outside James saw the Branch Manager ("Branch Manager") of Area Operations Center 478 ("AOC") and Team Manager's supervisor. James explained to Branch Manager that she was not feeling well.

34.    Branch Manager recognized James' distress, as well, and convinced her to go to the hospital for treatment.

6

35. James did not feel comfortable divulging the entire incident with Team Manager to Branch Manager because Team Manager and Branch Manager were personal friends outside of work.

36. When James arrived at the hospital, her heart rate was up and her head was pounding. The treating physician said that the increased heart rate and headache were due to stress. She was given a prescription for medication to treat her stress and anxiety. The physician told her to follow up with her primary care doctor or a psychiatrist. James then went home to rest.

37. Later that evening when James checked her voicemail, she had a message from Team Manager, who called James from her personal cell phone, telling her that she needed a doctor's note to return to work. Rather than call to check on James' well being, Team Manager called to harass James further and cause additional stress and anxiety.

38. James went in to work on Saturday, April 9, 2011 to email Assistant Branch Manager about the incident the previous day and about her need for medical leave until she followed up with her doctor on April 13, 2011. In the email James said, "I came to you before and said that I can't take her hollering at me. The screaming, hollering, bullying, lies, and harassment has got to stop. That's not managing its abuse." James also explained that Team Manager expected her to do a white coworker's work and keep up with her own. James asked Assistant Branch Manager to ask Team Manager not to call her because she needed to avoid all stress, but she asked him to call her.

39. On Monday April 11, 2011, James contacted Advice and Counsel and spoke with a representative ("Advice and Counsel 1"). James reported that she felt that she was being

7

harassed and discriminated against because of her race. Instead of initiating an investigation into her complaint, Advice and Counsel 1 referred James back to Assistant Branch Manager.

40. James was discouraged by this since BAC's policy states that if an employee does not feel comfortable going to management with complaints, the employee should contact Advice and Counsel.

41. Advice and Counsel 1 ignored James' complaint. Despite this, James followed up with Assistant Branch Manager per Advice and Counsel 1's direction. She left him a voicemail to call her back.

42. Having lost faith in the Company and exhausting internal remedies, James filed a Charge of Discrimination with the EEOC on April 11, 2011.

43. On April 12, 2011, James visited her primary care physician, who advised her to take a medical leave because of her stress.

44. James took medical leave on or about April 12, 2011 due to stress on the job. The following day, April 13, 2011, James went to see a psychiatrist who wrote her out of work due to stress and referred her to an outpatient day treatment program.

45. James applied for short-term disability and contacted Assistant Branch Manager and Team Manager to advise them of the leave.

46. On April 14, 2011, Branch Manager contacted James to inform her that BAC was laying her off. Branch Manager said that she had James' package and tried to explain the severance plan to her. Branch Manager then said that she needed to contact HR to determine how to proceed in light of James' medical leave.

47. A few minutes later, Branch Manager called James back and said that the layoff was effective as of April 14, 2011, regardless of James' leave of absence.

8

48.     James then contacted HR, who advised her to speak with Advice and Counsel. HR transferred James to Advice and Counsel 1 to discuss the situation. Advice and Counsel 1 informed her that BAC could not terminate her employment while she was on a leave of absence and that Assistant Branch Manager should have contacted her to inform her of this and to follow up about the incident, but he did not.

49.     James told Advice and Counsel 1 during this call that she believed that her lay off was the result of racial discrimination.

50.     When James started her leave of absence and BAC selected her for termination, she and a coworker were tied for the most loans in closing.

51.     Additionally, shortly before her selection for layoff, James received two global recognitions, which Team Manager informed her no one else had ever achieved. Further, James consistently received great reviews and raises, was never written up, and processed quality loans.

52.     Despite her performance and exemplary work history with BAC, James was targeted for lay off after reporting Team Manager's racial harassment, discrimination, and hostile work environment to management and Advice and Counsel and in retaliation for filing a Charge of Discrimination with the EEOC.

53.     On April 15, 2011, James received the severance package at her home via Federal Express. Upon receipt, she contacted Advice and Counsel 1 again. During the conversation, James told Advice and Counsel 1 that she complained about harassment and discrimination long before her termination. James reminded Advice and Counsel 1 that the last time James asked Advice and Counsel 1 for assistance, Advice and Counsel 1 referred her back to Assistant Branch Manager, who did not return her phone call. James also reminded Advice and Counsel 1 of the BAC policy that stated if an employee was having problems that she felt management

9

could not assist or if she felt uncomfortable talking with management, she could turn to Advice and Counsel at anytime. James told Advice and Counsel 1 she would send her more detailed information, which she sent her by email. James also sent the information to another HR representative.

54. In the detailed information that James provided to Advice and Counsel, James said, "I am sending you this letter to advise you of the things that have been occurring on my team. I have not been trained properly, have been screamed at, and have been lied on [sic], harassed, bullied, humiliated, traumatized and stressed out. I do believe that I am being discriminated against due to my race because she only hollers and scream [sic] at all the blacks and one white female who hung around us. Even when I would try to get proper training, she would not follow through. Even when I would have work of my own, she would make me assist some of the other white co-workers but would never ask me to assist the black workers."

55. Upon information and belief, the day after James was notified of her termination, BAC, through its management employees, hired a white temporary employee into a permanent position. Upon information and belief, management tried to push the permanent hire through quickly so that nobody would realize she was hired after permanent employees were laid off.

56. Upon information and belief, all temporary employees in AOC 478 should have been released before permanent employees were laid off.

57. James assisted and coached this temporary employee on many occasions. Upon information and belief, this temporary employee did not perform as well as James.

58. Upon information and belief, BAC, through its management employees, hired a second white temporary employee into a permanent position after laying off black permanent employees.

10

59.     On or about April 25, 2011, James interviewed with the outpatient partial day treatment center and thereafter attended a three week treatment program for anxiety.

60.     In May 2011, James contacted Advice and Counsel to follow up on her prior complaint. Advice and Counsel 1 was out of the office so James spoke with another representative ("Advice and Counsel 2").

61.     During this call, Advice and Counsel 2 mentioned to James that Team Manager reported James for misconduct and performance issues, which were untrue.

62.     Team Manager's attempt to sully James' job performance and character before termination was further retaliation for James' complaint.

63.     On May 16, 2011, Advice and Counsel 1 advised James that she was closing her case.

64.     James provided Advice and Counsel 1 with names of coworkers who could corroborate her complaint. Upon information and belief, BAC did not interview James' coworkers during the course of its investigation into James' complaint.

65.     Upon information and belief, Team Manager was demoted to a Loan Processor position as a result of her failure to appropriately manage the processing team and later terminated for a policy violation.

66.     On September 21, 2011, James advised BAC that her doctor was releasing her to return to work on October 13, 2011. James received no response, so she followed up by email on September 27, 2011. James did not receive a response to her second email either.

67.     James' physician released her to work part-time for two weeks on October 13, 2011, with a follow-up evaluation after that time.

11

68.     Since James had not received a response to her emails about returning to work, on or about October 14, 2011, James called the new Operations Manager, Thomas Jatulius, who instructed her not to return to work because she was selected for layoff. However, James was not provided her severance package until November 7, 2011. James was paid for the time between on or about October 14, 2011 and November 7, 2011.

69.     BAC's basis for selecting James for layoff was pretextual for unlawful race discrimination and retaliation for reporting unlawful harassment, discrimination, and filing a Charge of Discrimination

70.     On November 2, 2011, between the time James was able to return to work and when she received her severance package, James received an email from CareerBuilder.com with a job posting for her prior position, Home Services Specialist II, at Bank of America.

71.     James applied for the advertised Home Services Specialist II position on December 3, 2011. Despite her qualifications for the position and her positive performance history at BAC, James was not interviewed or rehired for the position.

72.     Upon information and belief, James is eligible for rehire.

73.     Upon information and belief, James was unlawfully rejected for the position in favor of someone not a member of the protected group (black) and in retaliation for filing a Charge of Discrimination with the EEOC.

74.     James also applied for a Senior Loan Closer position at BAC on December 3, 2011, for which she was qualified because she performed those duties for nine (9) years at Bank of America.

75.     Despite her qualifications for the position and her positive performance history at BAC, James was not interviewed or hired for the position.

12

76.     Upon information and belief, James was unlawfully rejected for the position in retaliation for filing a Charge of Discrimination with the EEOC.

77.     On June 25, 2012, James applied for another Home Services Specialist II position at BAC.

78.     On July 12, 2012, James interviewed for the second Home Services Specialist II position; the interview went well. The interviewer informed James that they were looking to hire eighty (80) people. At the end of the interview, the interviewer told James he was going to talk to Branch Manager, a white female. Later, the interviewer informed James that she was not selected for the position.

79.     Upon information and belief, Branch Manager, on behalf of BAC, gave the interviewer a negative reference of James in retaliation for reporting Team Manager's harassment and discrimination and because of her race, black.

80.     James has applied for a total four (4) positions since she was laid off and has not been offered any of the positions although she is qualified for the positions.

81.     BAC, acting through its managers, employees, and agents, deviated from the Company's normal anti-harassment and equal employment opportunity policies when harassed and discriminated against James and failure to hire James on the basis of her race and in retaliation for her prior charges of discrimination, harassment, and retaliation.

## COUNT ONE
(Title VII, 42 U.S.C. § 2000e *et seq.* - Race Discrimination, Harassment, and Retaliation)

82.     Plaintiff realleges and incorporates by reference the paragraphs above.

83.     Upon information and belief, Team Manager is a white female.

84.     James is a black female.

85. Team Manager treated the black employees less favorably than the white employees. Upon information and belief, Team Manager thought the black employees were lesser or second class citizens.

86. Team Manager harassed and intimidated James, treated her differently than her white counterparts, and even instructed her to take on their workload.

87. When Team Manager harassed James and instructed her to take on the workload of white coworkers, it was to the detriment of her own work, since she was not allowed to work overtime.

88. Upon information and belief, white employees were white allowed to work overtime.

89. Team Manager racially segregated the seating of white employees from black or minority employees.

90. Defendant, through their employees and agents, harassed and treated James disparately compared to other employees because of her race by ignoring her complaints of racial discrimination, failing to adequately investigate James' complaints of racial discrimination, and terminating her employment after she filed a Charge of Discrimination with the EEOC and requested a leave of absence due to stress from work.

91. Upon information and belief, James' race was a motivating factor for Defendant's actions.

92. James complained to Assistant Branch Manager about Team Manager's hostile work environment, harassment, discrimination, and disparate treatment as well as to Advice and Counsel 1, Advice and Counsel 2, and a third person from Advice and Counsel, after her complaints to Assistant Branch Manager were fruitless.

14

93.     Upon information and belief, Defendant did not conduct an investigation or did not conduct an adequate investigation into James' report of racial harassment, hostile work environment, discrimination, and retaliation.

94.     Upon information and belief, Defendant, through its employees and agents, retaliated against James for reporting the racial harassment, hostile work environment, and discrimination by treating James differently than white employees, disparaging James in the work place, fabricating complaints of misconduct and poor performance against James, selecting James and other black employees for layoff when it was hiring white temporary employees into permanent positions, and refusing to hire James for open positions for which she is qualified.

95.     On November 2, 2011, James received an email from CareerBuilder.com with a job posting post for her prior position, Home Services Specialist II, at Bank of America.

96.     James applied for the advertised Home Services Specialist II position on December 3, 2011. Despite her qualifications for the position and her positive performance history at BAC, James was not interviewed or rehired for the position.

97.     Upon information and belief, James was unlawfully rejected for the position in retaliation for filing a Charge of Discrimination with the EEOC.

98.     James also applied for a Senior Loan Closer position at BAC on December 3, 2011, for which she was qualified because she performed those duties for nine (9) years at Bank of America.

99.     Despite her qualifications for the position and her positive performance history at BAC, James was not interviewed or hired for the position.

100.    Upon information and belief, James was unlawfully rejected for the position in retaliation for filing a Charge of Discrimination with the EEOC.

101. James has applied for a total four (4) positions since she was laid off and has not been offered any of the positions position although she is qualified for the positions.

102. BAC, acting through its managers, employees, and agents, deviated from the Company's normal anti-harassment and equal employment opportunity policies and harassed, intimidated, discriminated, and retaliated against James because of her race and in retaliation for filing a Charge of Discrimination with the EEOC in violation of Title VII.

103. In so acting, Defendant, through its employees and agents, either intended to cause, or was recklessly indifferent to the likelihood that its conduct would cause, severe emotional distress to James.

104. Defendant's conduct, through its employees and agents, did, in fact, cause severe emotional distress to James, including depression, anxiety, difficulty breathing, crying, pain, personal distress, difficulty thinking, concentrating, sleeping, and fatigue for which she attended outpatient partial day treatment.

105. Defendant's actions, through its employees and agents, as described above, was intentional, outrageous and aggravated, and included actual malice, oppression, insult, rudeness, indignity, and a reckless indifference to James' rights and interests under Title VII. As a result, James is entitled to an award of punitive damages.

106. Defendant's conduct, as described above, was without justification or excuse, was reprehensible, lasted throughout James' employment, and occurred despite James' complaints to members of management and Advice and Counsel, and her efforts to stop the intimidation, harassment, discrimination, and retaliation.

16

107. James is now and will continue to be unlawfully deprived of income in the form of wages, compensation, and other monetary and non-monetary benefits due to her because of her race in an amount to be proven at trial.

108. As a result, James is entitled to have and recover all damages resulting from Defendant's misconduct, in an amount in excess of ten thousand dollars ($10,000.00), to be proven at trial, including compensatory, consequential, special, liquidated, and punitive damages, reinstatement, injunctive relief to deter similar misconduct in the future, back pay, front pay, damages for emotional distress, prejudgment interest, reasonable attorneys' fees, and the costs of this action.

## COUNT TWO
### (42 U.S.C. § 1981 - Race Discrimination, Harassment, Retaliation, and Failure to Hire)

109. Plaintiff realleges and incorporates by reference the paragraphs above.

110. Team Manager treated the black employees less favorably than the white employees. Upon information and belief, Team Manager thought the black employees were lesser or second class citizens.

111. Team Manager harassed and intimidated James, treated her differently than her white counterparts, and even instructed her to take on their workload to the detriment of her own work, since she was not allowed to work overtime.

112. Upon information and belief, white employees were white allowed to work overtime.

113. Team Manager racially segregated the seating of white employees from black or minority employees.

114. Defendant, through their employees and agents, harassed and treated James disparately compared to other employees because of her race by ignoring her complaints of racial

17

discrimination, failing to adequately investigate James' complaints of racial discrimination and harassment, and retaliating against her because of her race.

115. James is a member of a racially protected class, which is black. Team Manager and Branch Manager are white.

116. Upon information and belief, James' race was a motivating factor for Defendant's actions.

117. BAC ratified, authorized, or approved Team Manager's discriminatory acts and is vicariously liable for the acts and omissions of Team Manager and Branch Manager.

118. BAC, acting through its managers, employees, and agents, intentionally violated 42 U.S.C. § 1981 by illegally harassing, intimidating, and discriminating against James, terminating her employment, and retaliating against James by failing to rehire her because of her race.

119. Upon information and belief, James was rejected for the positions for which she applied in favor of persons who are not members of the protected group, black. BAC, through its managers, employees and agents, viewed whites more favorably than blacks.

120. James has applied for four (4) positions since she was laid off and has not been offered a position.

121. On November 2, 2011, James received an email from CareerBuilder.com with a job posting post for her prior position, Home Services Specialist II, at Bank of America.

122. James applied for the advertised Home Services Specialist II position on December 3, 2011. Despite her qualifications for the position and her positive performance history at BAC, James was not interviewed or rehired for the position.

18

123. Upon information and belief, James was unlawfully rejected for the position in favor of someone not a member of the protected group (black).

124. James also applied for a Senior Loan Closer position at BAC on December 3, 2011, for which she was qualified because she performed those duties for nine (9) years at Bank of America.

125. Despite her qualifications for the position and her positive performance history at BAC, James was not interviewed or hired for the position.

126. Upon information and belief, James was unlawfully rejected for the position in favor of someone not a member of the protected group (black).

127. On June 25, 2012, James applied for another Home Services Specialist II position at BAC and a Workout Specialist position at BAC, both of which she was qualified to perform.

128. On July 12, 2012, James interviewed for the Home Services Specialist II position; the interview went well. The interviewer informed James that they were looking to hire eighty (80) people. At the end of the interview, the interviewer told James he was going to talk to Branch Manager, a white female. After which, James was informed she was not selected for the position.

129. Upon information and belief, Branch Manager, on behalf of BAC, gave the interviewer a negative reference of James in retaliation for reporting Team Manager's harassment and discrimination and because of her race, black.

130. Upon information and belief, James was unlawfully rejected for the positions she applied for on June 25, 2012 in favor of persons who are not members of the protected group (black).

19

131.    James has applied for a total four (4) positions since she was laid off and has not been offered any of the positions because of her race (black) although she is qualified for the positions.

132.    BAC, acting through its managers, employees, and agents, deviated from the Company's normal anti-harassment and equal employment opportunity policies when it allowed Team Manager and Branch Manager to harass and discriminate against James and then retaliated against her by failing to hire James on the basis of her race.

133.    BAC, acting through its managers, employees, and agents, unlawfully discriminated against James because of her race in that: a) they subjected James to a markedly hostile work environment which a reasonable person would find objectively offensive; b) they treated similarly situated white employees differently; and, c) they did not terminate or fail to rehire similarly situated white employees.

134.    The acts and omissions committed by BAC, by and through its managers, employees and agents, were willful, wanton, oppressive, intentional, conscious, and malicious, and in deliberate disregard of James' civil rights.

135.    In so acting, Defendant, through its employees and agents, either intended to cause, or was recklessly indifferent to the likelihood that its conduct would cause, severe emotional distress to James.

136.    Defendant's conduct, through its employees and agents, did, in fact, cause severe emotional distress to James, including depression, anxiety, difficulty breathing, crying, pain, personal distress, difficulty thinking, concentrating, sleeping, and fatigue for which she attended outpatient partial day treatment.

137. Defendant's actions, through its employees and agents, as described above, was intentional, outrageous and aggravated, and included actual malice, oppression, insult, rudeness, indignity, and a reckless indifference of James' rights and interests under Section 1981. As a result, James is entitled to an award of punitive damages.

138. Defendant's conduct, as described above, was without justification or excuse, was reprehensible, lasted throughout James' employment, and occurred despite James' complaints to members of management and HR, and her efforts to stop the intimidation, harassment, discrimination, and retaliation.

139. James is now and will continue to be unlawfully deprived of income in the form of wages, compensation, and other monetary and non-monetary benefits due to her because of her race in an amount to be proven at trial.

140. As a result, James is entitled to have and recover all damages resulting from Defendant's misconduct, in an amount in excess of ten thousand dollars ($10,000.00), to be proven at trial, including compensatory, consequential, special, liquidated, and punitive damages, reinstatement, injunctive relief to deter similar misconduct in the future, back pay, front pay, damages for emotional distress, prejudgment interest, reasonable attorneys' fees, and the costs of this action.

## COUNT THREE
### (Wrongful Termination in Violation of Public Policy – Equal Employment Practices Act)

141. The allegations of the previous paragraphs are realleged and incorporated herein by reference.

142. After working for BAC as a loan closer, James transferred into a position as a loan processor on or about January 3, 2011.

21

143. James' supervisor, Team Manager, who is a white female, treated James, who is a black female, and other minority coworkers disparately.

144. James was harassed and discriminated against because of her race.

145. After complaining about the racial discrimination to management and HR, and filing a Charge of Discrimination, she was terminated.

146. Defendant, through its employees and agents, harassed, discriminated against, treated James disparately compared to white employees because of her race and terminated her employment in violation of the public policy of North Carolina in the Equal Employment Practices Act, N.C. Gen. Stat. 143-422.1 *et seq.*

147. Defendant, through its employees and agents, terminated James' employment for discriminatory and unlawful reasons.

148. Defendant treated white employees more favorably than black employees.

149. James has applied for two Home Services Specialist II positions, a Loan Closer position, and a Workout Specialist position but has not been rehired, despite her qualifications for the positions and her positive performance history at BAC.

150. Upon information and belief, James was unlawfully rejected for the positions in favor of someone not a member of the protected group (black).

151. Plaintiff's race was a motivating factor for Defendant's actions.

152. The acts and omissions committed by BAC, by and through its managers, employees and agents, were willful, wanton, oppressive, intentional, conscious, and malicious, and in deliberate disregard of James' civil rights.

22

153. In so acting, Defendant, through its employees and agents, either intended to cause, or were recklessly indifferent to the likelihood that their conduct would cause, severe emotional distress to James.

154. Defendant's conduct, through their employees and agents, did, in fact, cause severe emotional distress to James, including depression, anxiety, difficulty breathing, crying, pain, personal distress, difficulty thinking, concentrating, sleeping, and fatigue for which she attended outpatient partial day treatment.

155. Defendant's actions, through its employees and agents, as described above, were intentional, outrageous and aggravated, and included actual malice, oppression, insult, rudeness, indignity, and a reckless and wanton disregard of James's rights and interests. As a result, James is entitled to an award of punitive damages.

156. Defendant's conduct, as described above, was without justification or excuse, was reprehensible, lasted throughout James's employment, and occurred despite James's complaints to members of management and HR and her efforts to stop the harassment, intimidation, discrimination and retaliation.

157. As a direct and proximate result of Defendant's unlawful conduct, James is now and will continue to be unlawfully deprived of income in the form of wages, compensation, and other monetary and non-monetary benefits due to her, in an amount to be proven at trial.

158. As a result, James is entitled to have and recover all damages resulting from Defendant's misconduct, in an amount in excess of ten thousand dollars ($10,000.00), to be proven at trial, including compensatory, consequential, special, and punitive damages, back pay, front pay, damages for emotional distress, prejudgment interest, and the costs of this action.

## COUNT FOUR
### (Negligent Supervision)

23

159. Plaintiff realleges and incorporates by reference the paragraphs above.

160. Defendant, through its employees, witnessed and had knowledge of, or upon a reasonable investigation should have had knowledge of, the racial harassment, intimidation, hostile work environment, discrimination and retaliation of Plaintiff, as described above.

161. Defendant, through its employees, breached its duty to Plaintiff by negligently supervising Team Manager, subjecting Plaintiff to the racial harassment, intimidation, hostile work environment, discrimination, and retaliation of Team Manager, and failing to investigate, address, and stop the hostile work environment, harassment, intimidation, discrimination, and retaliation by Team Manager.

162. Defendant's acts of negligent, willful, and wanton conduct, through its management employees or employees charged with conducting investigations in failing to supervise or properly investigate Team Manager are a direct and proximate cause of the injuries and damages suffered by Plaintiff.

163. The acts and omissions committed by BAC, by and through its managers, employees and agents, were willful, wanton, oppressive, intentional, conscious, and malicious, and in deliberate disregard of James' rights.

164. In so acting, Defendant, through its employees and agents, either intended to cause, or were recklessly indifferent to the likelihood that their conduct would cause, severe emotional distress to James.

165. Defendant's conduct, through their employees and agents, did, in fact, cause severe emotional distress to James, including depression, anxiety, difficulty breathing, crying, pain, personal distress, difficulty thinking, concentrating, sleeping, and fatigue for which she attended outpatient partial day treatment.

24

166. Defendant's actions, through its employees and agents, as described above, were intentional, outrageous and aggravated, and included actual malice, oppression, insult, rudeness, indignity, and a reckless and wanton disregard of James's rights and interests. As a result, James is entitled to an award of punitive damages.

167. Defendant's conduct, as described above, was without justification or excuse, was reprehensible, lasted throughout James's employment, and occurred despite James's complaints to members of management and HR and her efforts to stop the harassment, intimidation, discrimination and retaliation.

168. Plaintiff has been damaged and is entitled to recover from Defendant compensatory, consequential, special, and punitive damages, back pay, front pay, prejudgment interest, damages for emotional distress, and the costs of this action in an amount in excess of ten thousand dollars ($10,000) to be proven at trial.

## COUNT FIVE
### (Negligent Retention)

169. Plaintiff realleges and incorporates by reference the paragraphs above.

170. Defendant, through its managers, employees, and agents, was negligent in retaining Team Manager by failing to use the ordinary care of a reasonable and prudent person to: adequately investigate allegations regarding her racially harassing, intimidating, hostile, discriminatory, and retaliatory conduct, consider her personal motivations, and protect Plaintiff from harm.

171. Defendant participated in and condoned the unlawful activity of Team Manager by failing to investigate and cease her racially harassing, intimidating, hostile, discriminatory, and retaliatory conduct and acting in reliance on Team Manager's defamatory and false statements with a reckless disregard for the truth.

25

172.    Defendant's negligent retention of Team Manager was the proximate cause of Plaintiff's injuries.

173.    The acts and omissions committed by BAC, by and through its managers, employees and agents, were willful, wanton, oppressive, intentional, conscious, and malicious, and in deliberate disregard of James' rights.

174.    In so acting, Defendant, through its employees and agents, either intended to cause, or were recklessly indifferent to the likelihood that their conduct would cause, severe emotional distress to James.

175.    Defendant's conduct, through their employees and agents, did, in fact, cause severe emotional distress to James, including depression, anxiety, difficulty breathing, crying, pain, personal distress, difficulty thinking, concentrating, sleeping, and fatigue for which she attended outpatient partial day treatment.

176.    Defendant's actions, through its employees and agents, as described above, were intentional, outrageous and aggravated, and included actual malice, oppression, insult, rudeness, indignity, and a reckless and wanton disregard of James's rights and interests. As a result, James is entitled to an award of punitive damages.

177.    Defendant's conduct, as described above, was without justification or excuse, was reprehensible, lasted throughout James's employment, and occurred despite James's complaints to members of management and HR and her efforts to stop the harassment, intimidation, discrimination and retaliation.

178.    Plaintiff has been damaged and is entitled to recover from Defendant compensatory, consequential, special, and punitive damages, back pay, front pay, prejudgment

Case 3:12-cv-00818-MOC-DSC   Document 1-1   Filed 12/11/12   Page 27 of 35

interest, damages for emotional distress, and the costs of this action in an amount in excess of ten thousand dollars ($10,000) to be proven at trial.

## COUNT SIX
### (Negligent Infliction of Emotional Distress)

179. Plaintiff realleges and incorporates by reference the paragraphs above.

180. Defendant was negligent in its failure to follow a duty of conduct imposed by law and its failure to use ordinary care in its conduct toward James.

181. Defendant allowed Team Manager to harass, intimidate, discriminate, create a hostile work environment, and retaliate against James because of her race.

182. Defendant allowed Team Manager to treat black employees less favorably than white employees.

183. Defendant allowed Team Manager to racially segregate the white employees from the black or minority employees.

184. Defendant allowed Team Manager to verbally harass, intimidate, and berate James, give James assignments with unreasonable deadlines, and instruct James to assist her white coworkers with their workload preventing James from completing her own workload and assignments.

185. Defendant allowed Team Manager to verbally and emotionally abuse James, failed to instruct Team Manager to cease her abusive conduct, and failed to protect James from Team Manager's abusive conduct despite James' complaints to Assistant Branch Manager and Advice and Counsel.

186. Defendant's negligence was a proximate cause of James' severe emotional distress.

27

187. The acts and omissions committed by BAC, by and through its managers, employees and agents, were willful, wanton, oppressive, intentional, conscious, and malicious, and in deliberate disregard of James' rights.

188. In so acting, Defendant, through its employees and agents, either intended to cause, or were recklessly indifferent to the likelihood that their conduct would cause, severe emotional distress to James.

189. Defendant's conduct, through their employees and agents, did, in fact, cause severe emotional distress to James, including depression, anxiety, difficulty breathing, crying, pain, personal distress, difficulty thinking, concentrating, sleeping, and fatigue for which she attended outpatient partial day treatment.

190. Defendant's actions, through its employees and agents, as described above, were intentional, outrageous and aggravated, and included actual malice, oppression, insult, rudeness, indignity, and a reckless and wanton disregard of James's rights and interests. As a result, James is entitled to an award of punitive damages.

191. Defendant's conduct, as described above, was without justification or excuse, was reprehensible, lasted throughout James's employment, and occurred despite James's complaints to members of management and HR and her efforts to stop the harassment, intimidation, discrimination and retaliation.

192. Plaintiff has been damaged and is entitled to recover from Defendant compensatory, consequential, special, and punitive damages, back pay, front pay, prejudgment interest, damages for emotional distress, and the costs of this action in an amount in excess of ten thousand dollars ($10,000) to be proven at trial.

WHEREFORE, Plaintiff respectfully prays the Court as follows:

1.      Pursuant to Count One (Title VII), Plaintiff have and recover judgment against Defendants, jointly and severally, for compensatory, consequential, special, liquidated, and punitive damages, reinstatement, injunctive relief to deter similar harassment, discrimination, and retaliation in the future, back pay, front pay, damages for emotional distress, prejudgment interest, reasonable attorneys' fees, and the costs of this action in an amount in excess of ten thousand dollars ($10,000.00), to be proven at trial;

2.      Pursuant to Count Two (§ 1981), Plaintiff have and recover of the Defendant, damages in excess of ten thousand dollars ($10,000.00), in an amount to be determined at trial, including compensatory, consequential, special, liquidated, and punitive damages, reinstatement, injunctive relief to deter similar misconduct in the future, back pay, front pay, damages for emotional distress, prejudgment interest, reasonable attorneys' fees, and the costs of this action;

3.      Pursuant to Count Three (Wrongful Termination in Violation of Public Policy), Plaintiff have and recover from Defendant damages in excess of ten thousand dollars ($10,000.00), in an amount to be determined at trial, including compensatory, consequential, special, and punitive damages, prejudgment interest, and the costs of this action;

4.      Pursuant to Count Four (Negligent Supervision), Plaintiff have and recover from Defendant damages in excess of ten thousand dollars ($10,000.00) in an amount to be determined at trial, including compensatory, consequential, special, and punitive damages, back pay, front pay, prejudgment interest, damages for emotional distress, and the costs of this action;

5.      Pursuant to Count Five (Negligent Retention), Plaintiff have and recover from Defendant damages in excess of ten thousand dollars ($10,000.00) in an amount to be

determined at trial, including compensatory, consequential, special, and punitive damages, back pay, front pay, prejudgment interest, damages for emotional distress, and the costs of this action;

6.      Pursuant to Count Six (Negligent Infliction of Emotional Distress), Plaintiff have and recover from Defendant damages in excess of ten thousand dollars ($10,000.00) in an amount to be determined at trial, including compensatory, consequential, special, and punitive damages for emotional distress, prejudgment interest, and the costs of this action;

7.      That this matter be tried by a jury; and

8.      Such other and further relief as this Court may deem just, proper, and equitable.

Respectfully submitted, this the 7th day of November, 2012.

**MALONEY LAW & ASSOCIATES, PLLC**

Margaret Behringer Maloney, N.C. Bar No. 13253
Tamara L. Huckert, N.C. Bar No. 35348
1824 E. 7th Street
Charlotte, NC 28204
mmaloney@maloneylegal.com
thuckert@maloneylegal.com
Telephone: 704-632-1622
Facsimile: 704-632-1623
*Attorneys for Plaintiff*

30

STATE OF NORTH CAROLINA

COUNTY OF MECKLENBURG

NEFERTITI JAMES,

     Plaintiff,

        v.

BANK OF AMERICA CORPORATION,

     Defendant.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
12-CVS-

**VERIFICATION**

STATE OF NORTH CAROLINA  )
                           )
COUNTY OF MECKLENBURG  )

     BEFORE ME, the undersigned authorized authority, in and for said State and County,

personally appeared Nefertiti James, who is known to me, and who, being by me first duly

sworn, deposes and says as follows: that the factual averments contained in the foregoing

Verified Complaint are true and correct to the best of his knowledge, information and belief.

                                              
                                    Nefertiti James

SWORN TO and subscribed before
me this 12th day of November, 2012

*Melissa B Hall*

NOTARY PUBLIC for the State of North Carolina
Mecklenburg County
My commission expires: *May 6, 2014*



31

CERTIFIED MAIL

7012 1640 0000 6935 7513

Charlotte PSDC NC 282

DATE 06 NOV 2012 PM

Maloney Law & Associates, PLLC
1824 East Seventh Street
Charlotte, NC 28204

Bank of America
c/o CT Corporation System
150 Fayetteville Street, Box 1011
Raleigh, NC 27601

# STATE OF NORTH CAROLINA

_____MECKLENBURG_____ County

File No.

12CVS19063

Film No.

In The General Court Of Justice
☐ District ☒ Superior Court Division

Name Of Plaintiff

NEFERTITI JAMES

**VERSUS**

Name Of Defendant

BANK OF AMERICA CORPORATION

### DELAYED SERVICE
### OF
### COMPLAINT

G.S. 1A-1, Rules 3 & 4

| TO: | TO: |
|---|---|
| Name And Address Of Defendant 1 | Name And Address Of Defendant 2 |
| BANK OF AMERICA<br>c/o CT CORPORATION SYSTEM<br>150 FAYETTEVILLE ST., BOX 1011<br>RALEIGH, NC 27601 | |

You are being served with a copy of the complaint in this action, the delayed filing of which was ordered when the summons was issued. You must:

1.  Serve a copy of your written answer to the complaint upon the plaintiff or the plaintiff's attorney within thirty (30) days after you have been served. You may serve your answer by delivering a copy to the plaintiff or the plaintiff's attorney or by mailing a copy to one of them at his/her last known address.

2.  File the original of the written answer with the Clerk of Superior Court of the county named above.

If you fail to answer the complaint, the plaintiff will apply to the Court for the relief demanded in the complaint.

| Name And Address Of Plaintiff's Attorney (If None, Address Of Plaintiff) | Date 11/7/12 | Time 4:45 | ☐ AM<br>☒ PM |
|---|---|---|---|
| Tamara L. Huckert<br>Maloney Law & Associates, PLLC<br>1824 East Seventh Street,<br>Charlotte, NC 28204 | Signature | | |
| | ☐ Deputy CSC | ☐ Assistant CSC | ☐ Clerk Of Superior Court |

Case 3:12-cv-00818-MOC-DSC    Document 1-1    Filed 12/11/12    Page 34 of 35

| | | |
|---|---|---|
| | **RETURN OF SERVICE** | |

I certify that this Document and a copy of the Complaint were received and served as follows:

### DEFENDANT 1

| Date Served | Name Of Defendant |
|---|---|
| | |

☐ By delivering to the defendant named above a copy of this Document and Complaint.

☐ By leaving a copy of this Document and Complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of this Document and Complaint to the person named below.

*Name And Address Of Person With Whom Copies Left (if corporation, give title of person copies left with)*

☐ Service Accepted By Defendant

| Date Accepted | Signature |
|---|---|
| | |

☐ Other Manner Of Service (specify)

☐ Defendant WAS NOT served for the following reason:

### DEFENDANT 2

| Date Served | Name Of Defendant |
|---|---|
| | |

☐ By delivering to the defendant named above a copy of this Document and Complaint.

☐ By leaving a copy of this Document and Complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of this Document and Complaint to the person named below.

*Name And Address Of Person With Whom Copies Left (if corporation, give title of person copies left with)*

☐ Service Accepted By Defendant

| Date Accepted | Signature |
|---|---|
| | |

☐ Other Manner Of Service (specify)

☐ Defendant WAS NOT served for the following reason:

| Service Fee Paid | Date Received | Name Of Sheriff |
|---|---|---|
| $ | | |
| Paid By | Date Of Return | County |
| | | Deputy Sheriff Making Return |

AOC-CV-103, Side Two, Rev. 3/98
© 1998 Administrative Office of the Courts